Rel: September 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2025

—————————————

### SC-2024-0700

—————————————

**Ex parte City of Birmingham**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Nicholas Raynard Smith, Jr.**

**v.**

**City of Birmingham)**

**(Jefferson Circuit Court: CV-21-901781)**

McCOOL, Justice.

The City of Birmingham ("the City") has petitioned this Court for a writ of mandamus, asking us to direct the Jefferson Circuit Court to enter a summary judgment in the City's favor with respect to the claims that Nicholas Raynard Smith, Jr., has asserted against it.

Facts and Procedural History

At approximately 9:30 p.m. on June 23, 2019, John Daniels, Jr., was driving south through Birmingham on Interstate 59 ("I-59"). While Daniels was driving in the left-hand lane, an automobile in the lane to his right struck the right side of his black Toyota Camry, which caused Daniels to lose control of his car and crash into the concrete median that separates the northbound and southbound lanes of I-59. There are streetlights spaced along that concrete median, and Daniels's car came to rest "somewhere between [streetlights] W066 and W067." "[R]ight after that, cars just started hitting [Daniels's] car" "back to back to back."

At the time of Daniels's accident, Smith and his friend Keith Holiness were traveling southbound on their motorcycles in the left-hand lane of I-59. Both men were traveling at or slightly above the 60-mile-per-hour speed limit, and both had their headlights turned on. Smith and Holiness reached the accident site almost immediately after

2

Daniels's car struck the concrete median; in fact, Holiness saw at least two collisions in that accident occur and testified in his deposition that the accident "was still going on" as he and Smith approached it. Holiness first noticed the accident when he was approximately 70 yards from it, and, according to Holiness, Smith noticed it "probably about the same time." Holiness swerved to the right of the cars that had been involved in the accident, but he struck the bumper of one of those cars, which sent him into "a high speed wobble." Holiness ultimately managed to bring his motorcycle to a stop a little further down I-59. Smith has no recollection of the accident, but, according to Holiness, Smith "hit the brakes" when he saw the accident but was unable to avoid colliding with Daniels's car. Smith suffered extensive injuries as a result of his accident, including "head trauma, facial injuries, injuries to his teeth, a fracture of the malar and maxillary bones, a foot fracture, a fractured pelvis, a pulmonary collapse, and other injuries."

It is undisputed that, when first responders arrived at the scene of the accident, "[street]lights … W066 … and W067 … were not operational." However, there is conflicting evidence as to whether those streetlights had been operational at the time of Daniels's accident.

According to Daniels, "the interstate lights were on that night before the accident," but he did not "actually look up any time before th[e] accident to observe which lights were working" and thus "could not give definitive testimony as to which light bulbs … were on or off at the time of [his] accident." Tommie Stinson, the City's division manager for signals and streetlights, testified in his deposition that the fact that streetlights W066 and W067 were not operational when first responders arrived did not necessarily mean that those streetlights had been inoperable at the time of Daniels's accident. According to Stinson, "[Daniels's] accident could have caused [streetlights W066 and W067] to go out" because "the wiring is in the median," so there "can be a hard enough impact [to the median] where it can shake and rattle the wiring in the pole itself and cause a short and malfunction in the circuit." Holiness testified in his deposition, however, that "[t]he [street]lights weren't on" when he and Smith "got on the interstate," and, although Smith has no recollection of his accident, he testified in his deposition that a "lighting problem" had existed at that part of I-59 "for years."

James Greer Fowler, the director of the City's Department of Transportation, testified in his deposition that it was "[his]

understanding … that the City … is responsible for the maintenance of the lighting" on that part of I-59 where Smith's accident occurred, and, according to Fowler, in April 2019 the City "undertook a significant project to replace and upgrade the light fixtures along that section of the interstate." That project was necessary, Fowler explained, because "some fixtures … were not working along that corridor, and also the type of fixtures that were along that corridor were outdated and really needed to be upgraded to more modern LED fixtures." Fowler also testified that, at the time of Smith's accident, the City's replacement project "had gotten to and beyond th[e] point where [Smith's accident] occurred."

Stinson testified in his deposition that the streetlights on I-59 were functioning properly following the City's April 2019 replacement project and that he had received "no notification from anyone that the lights were not working." Stinson acknowledged that, following the City's replacement project, there had briefly been "a breaker problem" and "two bad fuses" that had resulted in some inoperable streetlights, including streetlights W066 and W067. However, Stinson testified that those problems had been addressed on April 29, 2019, and that he had not

5

received any notice "that there was a problem with … light fixtures W061 through W070 … after that."

In June 2021, Smith filed a complaint against the City, asserting claims of negligence, wantonness/recklessness, and negligent/wanton hiring, training, supervision and/or retention.[1] According to Smith, the City "owed a duty to [him] … and all other motorists traveling on I-59 to ensure the interstate lights were maintained, repaired, and operable and to exercise reasonable care and due care maintaining the lights so [they] were working properly." Smith also alleged that the City "knew or should

---

[1]Smith also asserted "claims" of "respondeat superior" and "fictitious parties." However, the doctrine of "respondeat superior" is a theory of liability, not a legal claim. See O'Bryan v. Holy See, 556 F.3d 361, 370 n.1 (6th Cir. 2009) ("Plaintiffs also plead a separate cause of action titled 'Respondeat Superior Liability.' However, respondeat superior is not a cause of action. It is a basis for holding the [defendant] responsible for the acts of its agents."); Holford v. DiFabio, No. 21-02261, Dec. 6, 2021 (E.D. Pa. 2021) (not reported in Federal Supplement) ("Respondeat superior 'is merely a legal theory by which liability might be imposed, ... not a claim in its own right."); and Slabon v. Sanchez, No. 15-cv-8965, Sept. 13, 2021 (N.D. Ill. 2021) (not reported in Federal Supplement) ("[R]espondeat superior is not a claim that can stand on its own two feet."). Likewise the use of "fictitious parties" is not a legal claim but, instead, is a method by which a plaintiff may reserve the right to amend the complaint to add a defendant who is believed to have contributed to the plaintiff's harm but whose identity the plaintiff does not yet know. See Rule 9(h), Ala. R. Civ. P. Thus, although Smith purported to assert five claims in his complaint, he actually asserted only three cognizable legal claims.

have known of the non-working lights on [I-59] … through reports to [the City] by numerous sources, including published news articles, internet news articles, and television news stories that were aired prior to June 23, 2019." Thus, according to Smith, the City had "made a conscious decision to ignore this known condition of non-working interstate lights and the dark conditions of the interstate."

After filing an answer to the complaint, the City filed a motion to dismiss Smith's claims that alleged wantonness and recklessness. The circuit court granted that motion, thus leaving as the only remaining claims Smith's claims of negligence and negligent hiring, training, supervision and/or retention. The City then filed a motion for a summary judgment as to those claims, arguing that it was entitled to both municipal immunity, see § 11-47-190, Ala. Code 1975, and substantive immunity.

The circuit court held a hearing on the City's summary-judgment motion and, on September 20, 2024, issued an order denying the motion. That order states, in relevant part:

> "The record on file and counsel for the [City] indicate that the interstate lighting in question had been converted to LEDs on or about April 11, 2019. Then, a week later said lighting apparently malfunctioned and a 'fuse' had to be

replaced. The fact that a fuse needed to be replaced a week after converting the lights to LEDs could indicate to an impartial trier of fact that the City … was on notice that there was a problem with those particular lamps prior to the [motor-vehicle accident] which is the subject of this lawsuit. In which case, a jury should determine whether or not the streetlights were out, and if they were, did that proximately cause [Smith's] collision and subsequent injuries.

"The court finds that the remaining issues addressed in the [City's] motion are questions of fact to be determined by a jury."

The City timely petitioned this Court for a writ of mandamus, arguing that it is entitled to a summary judgment because, it says, Smith's claims are barred by both municipal immunity and substantive immunity.

Standard of Review

"A petition for a writ of mandamus is the appropriate avenue by which to seek relief from an order denying a claim of immunity. Ex parte City of Muscle Shoals, 384 So. 3d 37, 40 (Ala. 2023). To prevail on such a petition, the petitioner must show

"'"(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court. Ex parte Inverness Constr. Co., 775 So. 2d 153, 156 (Ala. 2000)."'

"Ex parte Gulf Health Hosps., Inc., 321 So. 3d 629, 632 (Ala. 2020) (quoting Ex parte BOC Grp., Inc., 823 So. 2d 1270, 1272 (Ala. 2001))."

8

Ex parte City of Orange Beach, [Ms. SC-2024-0526, Apr. 4, 2025] ___ So. 3d ___, ___ (Ala. 2025).

<u>Analysis</u>

We begin our analysis by reiterating that the only two claims that remain pending against the City are Smith's claims of negligence and negligent hiring, training, supervision and/or retention. However, in his answer to the City's petition, Smith has conceded that "[a] claim for negligent hiring, training, supervision, and/or retention … is due to be dismissed." Answer, p. 27. Thus, with respect to that claim, the City is entitled to relief, and our analysis will therefore focus solely on whether the City is entitled to a summary judgment on Smith's negligence claim. As to that claim, the City argues that Smith's claim is barred by both municipal immunity and substantive immunity, but we address only the City's substantive-immunity argument because we find that argument dispositive.

Section 11-47-190 provides, in relevant part:

"No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, <u>unless</u> such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer,

> or employee of the municipality engaged in work therefor and while acting in the line of his or her duty ...."

(Emphasis added.)  Thus, pursuant to § 11-47-190, "municipalities are generally chargeable with the negligence of their employees acting within the line and scope of their employment."[2] Payne v. Shelby Cnty. Comm'n, 12 So. 3d 71, 77 (Ala. Civ. App. 2008).  See also Tutwiler Drug Co. v. City of Birmingham, 418 So. 2d 102, 105 (Ala. 1982) (noting "a municipality's general liability for the negligence of its employees acting within the line and scope of their employment").

---

[2]Section 11-47-190 also states that cities and towns are liable for injuries that occur as the result of their

> "neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways, or buildings after the same had been called to the attention of the council or other governing body or after the same had existed for such an unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council or other governing body ...."

(Emphasis added.)  In other words, a municipality has a duty to keep its streets "free of defects."  City of Prichard v. Kelley, 386 So. 2d 403, 405 (Ala. 1980) (plurality opinion).  However, Smith does not contend that an inoperable streetlight constitutes a "defect in the streets," § 11-47-190, and prior caselaw tends to suggest that it does not.  See City of Prichard, 386 So. 2d at 405 (noting that "a defective traffic light" and "a missing stop sign" "could not realistically be categorized as a physical obstruction or defect in the street").

However, "before liability for negligence can be imposed, there must first be a legal duty owed to the person injured," Graveman v. Wind Drift Owners' Ass'n, 607 So. 2d 199, 203 (Ala. 1992), and, "'"[i]n Alabama, the existence of a legal duty is a strictly legal question to be determined by the court[s]."'" DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So. 2d 454, 460 (Ala. 2008) (citations omitted). Enter the doctrine of substantive immunity, which this Court adopted in 1982 in Rich v. City of Mobile, 410 So. 2d 385 (1982). The doctrine of substantive immunity provides that, with respect to certain public services provided by a municipality -- which, in Rich, were sewer-line inspections -- the municipality owes no legal duty to any individual and is therefore immune to any claim for damages that is based on the negligent performance of such services. As this Court explained in Ex parte City of Muscle Shoals, 384 So. 3d 37, 41 (Ala. 2023):

> "Generally, application of the rule of substantive immunity
>
> > "'"prevent[s] the imposition of a legal duty, the breach of which imposes liability, in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public services."'

11

"Payne v. Shelby Cnty. Comm'n, 12 So. 3d 71, 78 (Ala. Civ. App. 2008) (quoting Rich, 410 So. 2d at 387)."

This Court has made clear, however, that substantive immunity "'must be given operative effect only in the context of those public service activities of governmental entities … so laden with the public interest as to outweigh the incidental duty to individual citizens.'" Id. (quoting Rich, 410 So. 2d at 387-88).

The doctrine of substantive immunity is grounded in public-policy considerations, which are a factor to consider in any case in which a court must determine whether a legal duty exists. See Rich, 410 So. 2d at 386 (discussing the "overriding public policy reasons" for adopting the doctrine of substantive immunity); and Smitherman v. McCafferty, 622 So. 2d 322, 324 (Ala. 1993) (noting that, "[i]n determining whether a duty exists in a given situation, … courts should consider a number of factors, including public policy"). As this Court recently explained, to subject a municipality to tort liability "'in those narrow areas of governmental activities essential to the well-being of the governed'" would be to "'materially thwart the [municipality's] legitimate efforts to provide such public services' in the first place." Ex parte City of Orange Beach, ___ So.

12

3d at ___, ___ (quoting Rich, 410 So. 2d at 387) (emphasis omitted).  For example, with respect to a municipality's decision to provide various safety inspections, this Court has acknowledged that

> "'[t]he fact that the law does not mandate that a municipality provide inspections in order to protect the lives and property of its residents tends to increase the probability that the imposition of tort liability in this area would serve only to destroy the municipality's motivation or financial ability to support this important service.'
>
> "[Hilliard v. City of Huntsville,] 585 So. 2d [889,] 892 [(Ala. 1991)].  In other words, if municipalities are to be held liable for negligently performing inspections that they are under no obligation to perform in the first place, then they will likely simply stop performing the inspections."

Id. at ___.  However, substantive immunity is not limited to safety inspections but, instead, may apply to any public service that a municipality "provide[s] for the public's safety, health, and general welfare." Ex parte City of Muscle Shoals, 384 So. 3d at 44. See id. at 41 ("In announcing this rule of 'substantive immunity,' the [Rich] Court did not restrict the application of the rule to sewer-line-inspection cases ….").

The City argues that substantive immunity applies in this case, i.e., that it owed no legal duty to Smith to maintain operable streetlights on that part of I-59 where his accident occurred, and it argues that allowing

13

Smith's negligence claim to proceed would "subject [the City] to suit and liability for every nighttime accident on the interstate." Petition, p. 26. That, the City argues, "is specifically what substantive immunity [was] designed to prevent." Id. at 26-27. Smith argues in response that the City may be held liable for his injuries because, he says, the City has "acknowledg[ed] its duty" to maintain certain streetlights on I-59 but then "failed to act in a reasonable manner" by ensuring that those streetlights remained operable. Answer, p. 22. Thus, we must determine whether substantive immunity should apply to this type of public service, i.e., the maintenance of streetlights, or whether the City owed Smith (and other individuals) a legal duty to maintain the streetlights on that part of I-59 where Smith's accident occurred.

In making this determination, we begin by noting that we are not aware of any statute that requires a municipality to provide or maintain streetlights on an interstate highway (or any other roadway) that lies within the municipality's territorial limits. We also are not aware of any such requirement under the common law, and other jurisdictions have explained that a municipality has no common-law duty to provide or maintain streetlights. See, e.g., Fishbaugh v. Utah Power & Light, 969

14

P.2d 403, 405, 406 (Utah 1998) (noting that "'[a] municipality has no common-law duty to light its streets'" and that, "[b]ecause a municipality has no common law duty to light its streets, it has no duty to maintain such lights that it has nevertheless elected to install" (quoting 19 Eugene McQuillin, The Law of Municipal Corporations § 54.101 (3d ed. 1994))). A municipality does have a duty to warn of a dangerous condition in or near a street, and, thus, this duty might require a municipality to provide and maintain streetlights in some specific situations. See Hale v. City of Tuscaloosa, 449 So. 2d 1243, 1246 (Ala. 1984) ("A city … has a duty to warn of a dangerous condition on or near the roadway."); and City of Birmingham v. Cox, 230 Ala. 99, 101, 159 So. 818, 820 (1935) (noting that, "'where there are dangerous obstructions, declivities, or excavations in or near [a] street,'" a municipality has a duty, upon receiving notice of the defect, "'to take proper precautions to guard against accidents by the use of railings, barriers, lights or the like, especially at night'" (emphasis added; citation omitted)). However, even if that duty applies to an interstate highway, it is not applicable in this case because Smith's accident did not occur as the result of a dangerous condition in I-59 itself. See Mixon v. Pacific Gas & Elec. Co., 207 Cal.

App. 4th 124, 137, 142 Cal. Rptr. 3d 633, 644 (2012) (noting that "diminished visibility that comes with nightfall is not evidence of a dangerous condition" in a roadway).

That said, Smith correctly notes that, although it was under no statutory or common-law duty to do so, the City voluntarily assumed the responsibility of maintaining the streetlights on that part of I-59 where his accident occurred. Fowler, the director of the City's Department of Transportation, testified as follows during his deposition:

> "Q. [By Smith's counsel] … Let's … talk a little bit in general about lighting, okay. We know this accident happened on the interstate?
>
> "A. Correct.
>
> "Q. And … a lot of times there's an interplay of jurisdictions on interstate highways; is that correct?
>
> "A. Yes.
>
> "Q. Okay. In certain areas, certain governmental entities are responsible for upkeep and maintenance; is that right?
>
> "A. Yes.
>
> "Q. In this area here, we know that you've got an interstate highway, okay. Who is responsible for the general maintenance on the interstate highway in this area?

16

"A. My understanding is that the City of Birmingham is responsible for the maintenance of the lighting.

"Q. Okay. How was that determined? Because we know an interstate system has different jurisdictions. What's your understanding of when the City is responsible for it as opposed to the county, the state, or the federal government?

"A. Sure. My understanding is that when the interstate was built or when it was last worked on as a part of a significant project, particularly the lighting, when it's installed, the State of Alabama ... asks the cities, the municipalities, to sign maintenance agreements. That's pretty standard throughout Birmingham and throughout the state. So while I have not seen the exact document for that section, it seems like based on standards for elsewhere in the system, I believe that the City of Birmingham is responsible for the maintenance in this section of the lighting.

"Q. By virtue of an agreement with the State?

"A. Probably so.

"....

"Q. So it's not necessarily ... that a law says in certain instances the City does it and the State ... does it .... It's the City agrees with the State to maintain the light system?

"A. I'm not aware of a law, but it's common to use maintenance agreements between the municipalities and the State."

However, contrary to Smith's belief, the fact that a municipality voluntarily accepts the responsibility of performing a public service does not necessarily mean that it has imposed upon itself a legal duty, "'"the

17

breach of which imposes liability." ' " Ex parte City of Muscle Shoals, 384 So. 3d at 41 (citations omitted). Indeed, substantive immunity often shields municipalities from liability when they have voluntarily chosen to perform certain public services that they were under no obligation to perform -- namely, those services that are " 'for the public health, safety, and general welfare of its citizenry' " and are therefore " 'essential to the well-being of the governed.' " Id. (citation omitted). See, e.g., Hilliard v. City of Huntsville, 585 So. 2d 889, 892 (Ala. 1991) (holding that the City of Huntsville could not be held liable for damages stemming from an allegedly negligent electrical inspection that, "although not required by law to do so," the city had elected to perform); and Nichols v. Town of Mount Vernon, 504 So. 2d 732, 733 (Ala. 1987) (holding that the Town of Mount Vernon could not be held liable for the plaintiff's injuries, despite the fact that the town had "assumed a duty which the law d[id] not require of it, and, having assumed that duty," had allegedly breached it).[3]

_____

[3]In City of Prichard v. Kelley, 386 So. 2d 403 (Ala. 1980), a plurality of this Court held that, although the City of Prichard had no duty to erect a stop sign, once it chose to do so, it had a duty to maintain the sign and that its failure to do so exposed it to liability under "principles of ordinary negligence":

18

Regarding the public service at issue here -- the maintenance of streetlights -- caselaw from other jurisdictions supports the conclusion that a municipality owes no legal duty to any individual based on its voluntary choice to assume the responsibility of maintaining streetlights because that service is provided for the safety and benefit of the general public.  In <u>Cimato v. City of Lackawanna</u>, 158 A.D.2d 1000, 551 N.Y.S.2d 148 (1990), the plaintiff filed a negligence claim against the City of Lackawanna, alleging that his injuries had occurred because the city had failed to maintain the streetlights on a state highway.  The plaintiff conceded that the city had no statutory or common-law duty to provide

---

"'Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith.  See, e.g., <u>Robinson v. Harris</u>, 370 So. 2d 961 (Ala. 1979); <u>United States Fidelity & Guaranty Co. v. Jones</u>, 356 So. 2d 596 (Ala. 1978); <u>Beasley v. MacDonald Engineering Co.</u>, 287 Ala. 189, 249 So. 2d 844 (1971).'

"Applying this principle of law to the present case, we hold that in erecting the stop sign at Broadway and Main, the City of Prichard volunteered to act and was thereafter charged with the responsibility of acting with due care."

<u>Id.</u> at 406-07.  However, <u>City of Prichard</u> was decided before this Court adopted the doctrine of substantive immunity in <u>Rich</u>.

19

and maintain those streetlights, but he argued that, because the city had "voluntarily assumed the duty to provide and maintain street illumination, a 'special relationship' with plaintiff was created which required [the city] to exercise ordinary care in the performance of the duty it voluntarily assumed ...." 158 A.D.2d at 1000, 551 N.Y.S.2d at 148. The Appellate Division for the Fourth Department of the New York Supreme Court rejected that argument and, in support of its holding, stated:

> "In order to establish a prima facie case of negligence, [a] plaintiff must demonstrate the existence of a duty owed by the defendant to him .... [The City of Lackawanna's] action in providing the illumination along that portion of the State highway where plaintiff's accident occurred <u>was not 'to protect the interests of any individual except as they secure to all members of the community</u> the enjoyment of rights and privileges to which they are entitled only as members of the public. <u>Neglect in the performance of such requirements creates no civil liability to individuals</u>.'"

158 A.D.2d at 1000, 551 N.Y.S.2d at 148-49 (emphasis added; citation omitted).

In <u>Georgantonis v. Reading</u>, 156 N.E.3d 1037, 1045 (Ohio Ct. App. 2020), the Ohio Court of Appeals held that the City of Reading was entitled to immunity with respect to claims alleging its negligent "operation and maintenance of a street-lighting system," and, in support

20

of its holding, the court noted that "street lighting on a public street … is for the common good of all citizens of the state[] and … promotes or preserves the public peace, health, safety or welfare." Other courts have likewise noted, though not always in the context of addressing a municipality's immunity, that streetlights are generally provided for the safety and benefit of the general public. See Okeson v. City of Seattle, 150 Wash. 2d 540, 550, 78 P.3d 1279, 1285 (2003) ("Providing streetlights … is a governmental function [that] operate[s] for the benefit of the general public, and not for the 'comfort and use' of individual customers."); Miller v. Incorporated Town of Milford, 224 Iowa 753, 276 N.W. 826, 833 (1937) ("In exercising its powers to light streets, a town is acting in its governmental capacity and provides for the safety and protection of its citizens and their property and preservation of good order."); Wicks v. Salt Lake City, 60 Utah 265, 208 P. 538, 539 (1922) ("The primary purpose of lighting a street is to afford[] comfort, safety, and convenience to those who use the street …. This is certainly a public purpose."); and City of Little Rock v. Holland, 184 Ark. 381, 42 S.W.2d 383, 384 (1931) (noting that, "in lighting its streets," a municipality "is

engaged in the performance of a necessary governmental function, necessary for the convenience and safety of the public").

We agree with those courts. By maintaining the streetlights on an interstate highway, a municipality "provide[s] for the public's safety, health, and general welfare," Ex parte City of Muscle Shoals, 384 So. 3d at 44, or, stated differently, it provides a public service that is "'"essential to the well-being of the governed,"'" especially given an interstate highway's extensive volume of high-speed traffic. Id. at 41 (citations omitted). It is also a service that a municipality provides to countless motorists -- not only its own citizens but also out-of-town and out-of-state motorists -- and is therefore a service that is "'so laden with the public interest as to outweigh the incidental duty to individual citizens.'" Id. (citation omitted). In other words, "'[a]ny … duty [on the part of a municipality] to [maintain the streetlights on an interstate highway is a duty] owed to the public at large rather than to any individual.'" Ex parte City of Orange Beach, ___ So. 3d at ___ (citation omitted). With respect to other public services that fit this bill, this Court has not hesitated to hold that substantive immunity applies. See, e.g., Hilliard, supra (electrical inspections); Ex parte City of Tuskegee, 295 So. 3d 625 (Ala.

22

2019) (plurality opinion) (smoke-detector inspections); Ex parte City of Orange Beach, supra (alleged failure to ensure that a contractor's construction of a subdivision complied with zoning ordinances); Rich, supra (sewer-line inspections); Ex parte City of Muscle Shoals, supra (enforcement of ordinances regarding drainage systems); and Calogrides v. City of Mobile, 475 So. 2d 560 (Ala. 1985) (determination regarding how much police protection was required for a city-sponsored event).

We also cannot ignore the public-policy considerations that in Rich, supra, gave rise to the doctrine of substantive immunity in the first place. As we have already explained, a municipality has no statutory or common-law duty to maintain the streetlights on an interstate highway, but, according to Fowler, municipalities in Alabama commonly agree to perform this maintenance on behalf of the state government. It stands to reason, then, that if municipalities are subjected to tort liability for voluntarily agreeing to provide this important public service, then they "will likely simply stop performing" the service, Ex parte City of Orange Beach, ___ So. 3d at ___, which would be a disadvantage to everyone who travels on those parts of an interstate highway that lie within a municipality's territorial limits. Stated differently,

23

> "[t]he fact that the law does not mandate that a municipality [maintain the streetlights on an interstate highway] in order to protect the lives and property of its residents tends to increase the probability that the imposition of tort liability in this area would serve only to destroy the municipality's motivation or financial ability to support this important service."

<u>Hilliard</u>, 585 So. 2d at 892. Indeed, to hold that the City owes Smith and other individuals a legal duty to maintain certain streetlights on I-59 would essentially require the City to constantly and simultaneously monitor what are likely hundreds of streetlights so that it can immediately repair any and all inoperable streetlights before an accident occurs. <u>See</u> Petition, p. 26 (noting that the denial of substantive immunity "would require perpetual inspections" of the streetlights on I-59). This seems a particularly onerous task, if not an impossible one to perform, which tends to strengthen the likelihood that allowing tort liability in this area would simply encourage the City to stop agreeing to perform this important public service. <u>See</u> <u>White v. Southern California Edison Co.</u>, 25 Cal. App. 4th 442, 451, 30 Cal. Rptr. 2d 431, 437 (1994) (noting "the large number of streetlights" and "the likelihood that streetlights will become periodically inoperable" in holding that the

24

defendant did not owe the plaintiff a legal duty to maintain streetlights that the defendant had contracted to maintain).

We therefore hold that, when a municipality "'"chooses to provide for the public health, safety, and general welfare of its citizenry,"'" Ex parte City of Orange Beach, ___ So. 3d at ___ (citations omitted), by voluntarily assuming the responsibility of maintaining the streetlights on an interstate highway, it does not impose upon itself a legal duty of care to an individual who is allegedly injured as the result of inoperable streetlights. Thus, in the absence of a legal duty to that individual, the municipality cannot be held liable for his or her injuries, Graveman, supra, which is simply another way of saying that the doctrine of substantive immunity bars any claim against the municipality that seeks compensation for those injuries.

## Conclusion

The City is entitled to substantive immunity with respect to Smith's negligence claim, and Smith has conceded that his claim of negligent hiring, training, supervision and/or retention is due to be dismissed. Thus, we grant the City's petition for a writ of mandamus and direct the circuit court to enter a summary judgment in favor of the City.

25

PETITION GRANTED; WRIT ISSUED.

Stewart, C.J., and Shaw, Wise, Bryan, Cook, and Lewis, JJ., concur.

Sellers and Mendheim, JJ., concur in the result.